**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation,<br><br>THE CITY OF EUGENE, OREGON, acting by and through the EUGENE WATER AND ELECTRIC BOARD, a municipal utility corporation of the State of Oregon,<br><br>and<br><br>PACIFICORP, an Oregon corporation,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Civil Action No. 04-009C<br>(J. Bruggink) |

**FIRST AMENDED COMPLAINT**

Plaintiffs, Portland General Electric Company ("PGE"), the City of Eugene, Oregon, acting by and through the Eugene Water and Electric Board ("EWEB"), and PacifiCorp ("Pacific"), for their Complaint against Defendant, United States of America, state as follows:

**PARTIES**

1. Plaintiff PGE is an Oregon corporation with its registered office and principal place of business in Portland, Oregon. PGE owns 67.5 percent of and operated the nuclear generating plant known as the Trojan Nuclear Power Plant ("Trojan") near Rainier, Oregon. Trojan began commercial operation in 1975 and was formally shut down in January, 1993.

2. Plaintiff EWEB is an Oregon municipal utility corporation with its principal place of business in Eugene, Oregon. EWEB owns 30 percent of Trojan and has been responsible for

30 percent of all costs of operation of Trojan, and has reimbursed PGE for such costs pursuant to the Operating Agreement.

3. Plaintiff Pacific is an Oregon corporation with its registered office and principal place of business in Portland, Oregon. Pacific owns 2.5 percent of Trojan and has been responsible for 2.5 percent of all costs of operation of Trojan, and has reimbursed PGE for all costs pursuant to the Operating Agreement.

4. Since PGE, EWEB and Pacific have paid and are jointly responsible according to their respective ownership shares for all costs and expenses described herein, unless otherwise noted, they will be jointly referred to as the "Plaintiffs."

5. Defendant United States of America is a sovereign entity that is obligated to honor the terms of its contracts, and is subject to the requirements of applicable law, including the Fifth Amendment to the United States Constitution.

6. The United States Department of Energy ("DOE") is a department within the Executive Branch authorized to make contracts for the disposition of high level waste ("HLW") and spent nuclear fuel ("SNF") and to dispose of HLW/SNF.

**JURISDICTION**

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1491(a)(1).

**NATURE OF THIS ACTION**

8. This is an action for breach of contract; more specifically, it is an action alleging partial breach.

**SUMMARY OF PLAINTIFFS' CLAIMS**

9. PGE operated a nuclear power plant for purposes of generating electricity from the beginning of Trojan's commercial operation in 1975, until its shut down and defueling in January, 1993.

10. On June 13, 1983, PGE, on behalf of itself, EWEB, and Pacific Power & Light (a predecessor-in-interest of Pacific), entered into a written contract with the Defendant known as the Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, U.S. Department of Energy Contract No. DE-CR01-83NE4406, Audit # 3591 (the "Contract"), whereby the Plaintiffs agreed to purchase DOE's services for disposal of HLW/SNF produced at the Trojan facility. The Contract is attached as Exhibit 1 to the original Complaint and is incorporated by reference herein.

11. Under the Contract, Plaintiffs were required to make payments to Defendant in return for which the Defendant agreed to dispose of HLW/SNF beginning no later than January 31, 1998.

12. Plaintiffs timely made all payments required under the Contract, totaling approximately $104.9 million. Under the Contract, when PGE ceased operating Trojan in 1993, Plaintiffs' obligation to continue making payments to the Defendant for the removal of the HLW/SNF ceased. Thus, Plaintiffs have fulfilled all of their obligations under the Contract.

13. The Defendant failed to begin taking HLW/SNF by January 31, 1998, as required by the Contract, and announced that it will not begin to fulfill its contractual obligations until 2010, at the earliest.

14. The Defendant's actions amount to a breach of both the express terms of the Contract and the duty of good faith and fair dealing implied therein. Plaintiffs paid the specified

fees for HLW/SNF removal, but Defendant has failed to begin removing the HLW/SNF. As a result Plaintiffs have incurred costs of constructing and operating alternative storage facilities.

15. Defendant has received approximately $104.9 million from Plaintiffs pursuant to the Contract. Notwithstanding its breach, Defendant has retained all of the monies it received for removal of Plaintiffs' HLW/SNF and earned interest thereon.

16. For relief, Plaintiffs seek damages to compensate them for partial breach of contract.

17. No administrative procedures apply to this case. *Yankee Atomic Electric Co. v. United States*, 42 Fed. Cl. 223 (1998), *aff'd* 225 F.2d 1336 (Fed. Cir. 00). As set forth in *Yankee Atomic*, the Contract is not subject to the Contract Disputes Act, 41U.S.C. §§601-612, *id.*, and the Contract itself preserves Plaintiffs' rights to all remedies available at law and to other remedies as provided for by the Contract.

**STATEMENT OF FACTS**

**SNF/HLW and the NWPA**

18. SNF/HLW is made up of toxic and radioactive substances and results from the use of nuclear reactors. SNF/HLW must be specially maintained in isolated disposal facilities.

19. Congress enacted the Nuclear Waste Policy Act ("NWPA") in 1982. The NWPA codified and specifically recognized the federal government's "responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment...." 42 U.S.C. § 10131(a)(4).

20. The NWPA set out a process for storage and disposal of HLW/SNF. The NWPA authorized the Secretary of Energy to enter into contracts with owners and generators of

HLW/SNF to dispose of HLW/SNF. Pursuant to section 302 of the NWPA, a standard contract (the "Standard Contract") for the disposal of HLW/SNF was developed. 10 C.F.R. § 961.11.

**The Contract**

21. On June 13, 1983, Plaintiffs entered into the Standard Contract with Defendant to remove HLW/SNF from Trojan. As set forth above, under the Contract, Plaintiffs were obligated to pay fees to Defendant for the removal of the HLW/SNF. Plaintiffs have fully complied with that obligation and timely paid all fees due under the Contract. Specifically, Plaintiffs have paid approximately $104.9 million to Defendant under the Contract.

22. The Contract makes clear that "DOE is obligated and willing to provide such disposal services [for HLW/SNF] under the terms and conditions hereinafter set forth...." Exhibit 1, Preamble at 2.

23. Under the "Scope" of the Contract, DOE is specifically obligated to abide by a time schedule: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, <u>not later than January 31, 1998</u> and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors ... has been disposed of." ***Id.***, Article II at 6 (emphasis added).

24. Though disposal was generally to be prioritized by the age of the HLW/SNF, the Contract specifically provided that "[n]otwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life <u>or has been shut down permanently for whatever reason</u>." Contract, Exhibit 1, Article VI.B.1(b) at 15. (Emphasis added.)

25. The Trojan reactor has been shut down since 1993. Thus, under this provision, Plaintiffs' HLW/SNF could, should, and would have been given priority ranking for disposal under the Contract.

26. The Contract also sets forth the HLW/SNF producer's responsibilities. ***Id.***, Article IV.A at 6-8. In addition, the Contract sets forth specific fees and terms of payment. ***Id.***, Article VIII at 17-23. Specifically, the Contract recognizes the "Effect of Payment." ***Id.***, Article VIII.D at 22. In that regard, the Contract states: "[u]pon payment of all applicable fees, interest and penalties on unpaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW." ***Id.***

**The Government's Breach**

27. The Defendant was obligated, under the Contract, to begin disposing of HLW/SNF by January 31, 1998. As set forth above, the Contract also recognized the propriety of a priority for HLW/SNF to be removed from shut down reactors like Trojan.

28. Despite the Defendant's unambiguous obligation to begin disposing of HLW/SNF by January 31, 1998, the Defendant has wholly failed to dispose of any HLW/SNF.

29. In the 21 years since the NWPA was enacted, DOE has wholly failed to implement the HLW/SNF program set forth in the NWPA and has failed to meet its obligation to dispose of Trojan's HLW/SNF as provided for in the Contract. Moreover, it has consistently disregarded the priority for shut down plants recognized in the Contract.

30. While the Contract sets forth specific methods for the establishment of delivery commitment schedules, Defendant instead instructed Plaintiffs to provide schedules in accordance with DOE's announced annual capacity for the program. That capacity was both increasingly and unrealistically restrictive and inconsistent with DOE's contractual obligation to dispose of Plaintiffs' HLW/SNF.

31. Nevertheless, Plaintiffs timely provided delivery commitment schedules pursuant to DOE's instructions. But for Defendant's wrongful instructions, Plaintiffs would not have

submitted those schedules. The schedules that Plaintiffs were directed to submit were inconsistent with Defendant's contractual obligation to dispose of the HLW/SNF.

32. Plaintiffs have also submitted final delivery schedules for the disposal of Trojan's HLW/SNF in conformance with DOE's wrongful instructions and unrealistically restrictive annual capacity estimates for the HLW/SNF disposal program. Plaintiffs would not have submitted such schedules but for DOE's wrongful instructions. While DOE's Contract with Plaintiffs requires that DOE approve or disapprove of the schedules submitted by Plaintiffs within 60 days of their submission, DOE has failed to do so.

33. At least as early as 1989, DOE announced that it would not open an HLW/SNF repository until 2010 at the earliest.

34. Defendant's failure to prepare HLW/SNF disposal facilities caused various states and utilities, including Plaintiffs, to doubt whether the Defendant would fulfill its contractual obligations under the standard contracts.

35. In 1993, various utilities and states wrote to DOE to demand assurances that it would honor its contractual obligations.

36. On April 28, 1995, DOE issued its "Final Interpretation of Nuclear Waste Acceptance Issues" ("Final Interpretation"). 60 Fed. Reg. 21,793 (1995). In the Final Interpretation, DOE insisted that it did not have an unconditional statutory or contractual obligation to accept HLW/SNF beginning on January 1, 1998, in the absence of repositories or interim storage facilities constructed under the NWPA.

37. In anticipation of DOE's failure to honor its contractual obligation to begin accepting HLW/SNF on January 1, 1998 -- which could, should, and would have entailed a priority for HLW/SNF from Trojan as a shut down plant -- and as a means of mitigating their

damages from Defendant's breach, Plaintiffs preliminarily determined to construct an Independent Spent Fuel Storage Installation ("ISFSI") rather than retain the SNF in its wet storage facility. The ISFSI is a dry storage facility utilizing concrete casks for containment. The ISFSI will reduce operation and maintenance costs related to the continued storage of SNF at Trojan by more than $8 million per year, as compared to wet storage. Had the Defendant adhered to the schedule set forth in the Contract -- according priority to HLW/SNF from shut down plants -- Plaintiffs would not have constructed the ISFSI facility. However, Defendant's conduct -- including its failure even by 1993 to begin construction of the HLW/SNF storage facility and to announce a priority for HLW/SNF from shut down plants -- required that Plaintiffs begin planning to construct the ISFSI as a means of reducing their ongoing storage costs and thus mitigating their damages. Construction of the ISFSI was ultimately begun in 2000.

38. Numerous states and nuclear facilities (not including Plaintiffs) filed a petition for review of DOE's Final Interpretation in the United States Court of Appeals for the District of Columbia Circuit.

39. The U.S. Court of Appeals for the District of Columbia Circuit ruled on that petition on July 23, 1996 in *Indiana Michigan Power Co. v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996). The Court noted that NWPA section 302(a)(5)(B) did not condition DOE's obligation to dispose of HLW/SNF on the commencement of the operation of a repository: "In (B), Congress imposed no such condition, but rather directed the beginning of the Secretary's duty as 'no later than January 31, 1998,' without qualification or condition. The only limitation placed on the Secretary's duties under (B) is that that duty is 'in return for the payment of fees established by this section.'" *Id.* at 1276. Thus, the D.C. Circuit made clear that payment of fees

by the utilities was the only contractual precondition for DOE's obligation to dispose of the HLW/SNF by a date certain. *Id.*

40. In contravention of the Circuit Court's ruling in Indiana Michigan, DOE announced in December 1996 that it would not begin to dispose of HLW/SNF by the January 31, 1998 deadline. DOE suggested that this delay was "unavoidable" and thus might be excused under Article IX of the Standard Contract. DOE invited utilities to comment on the delay.

41. On January 31, 1997, a number of utilities (not including Plaintiffs) filed a petition for a writ of mandamus in the D.C. Circuit to compel DOE to comply with the D.C. Circuit's ruling in *Indiana Michigan* and to fulfill its unconditional obligations under the NWPA in the Standard Contract.

42. On June 3, 1997, DOE issued a letter responding to the comments submitted by utility signatories to the Standard Contract. In that letter, DOE stated that it had "preliminarily determined" that the delay in disposing of HLW/SNF was unavoidable. A June 3, 1997 contracting officer's preliminary determination to that effect was attached to the June 3 letter. That preliminary determination was entitled "Contracting Officer's Preliminary Determination That the Department of Energy's Delay in Beginning Spent Fuel Disposal Was Unavoidable." In this preliminary determination, DOE's purported difficulties in preparing permanent geological disposal sites to store HLW/SNF were described. DOE contended that the failure to construct those sites excused it from any obligation for a financial remedy to the signatories of the Standard Contract or from any purported delay, because the delay was unavoidable.

43. DOE's position as expressed in that June 3, 1997 letter and in the contracting officer's preliminary determination was rejected by the D.C. Circuit in *Northern States Power Co. v. United States*, 128 F.3d 754 (D.C. Cir. 1997). The *Northern States Power* opinion made

clear that the D.C. Circuit would not permit DOE to "absolve itself from bearing the cost of its delay if the delay is caused by the Government's own acts." *Id.* at 760.

44. The Court ordered "DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998. More specifically, we preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Id.* The Court specifically rejected DOE's argument that its performance of the contract was unavoidably delayed because it did not have an operational repository, as the exact same argument that the court had dismissed in *Indiana Michigan. Id.*

45. The holding by the D.C. Circuit in *Northern States Power* thus explicitly estops the Defendant from arguing that any liability it faces for breach of the Contract is excused by unavoidable delay or impossibility.

46. In an Order issued May 5, 1998, the D.C. Circuit reaffirmed its ruling in *Northern States Power*. *Northern States Power Co. v. United States*, 1998 U.S. App. LEXIS 12919 (D.C. Cir. May 5, 1998). While the D.C. Circuit refused to issue an Order compelling DOE to accept HLW/SNF, it reiterated that its decision in *Northern States Power* "barred" DOE from claiming that the Contract provided "only a contingent disposal obligation." *Id.* at *3.

47. On November 30, 1998, the Supreme Court declined to issue a writ of certiorari to review the D.C. Circuit's ruling. *Dept. of Energy v. Northern States Power, et al.*, 67 U.S.L.W. 3361 (1998); *see also Michigan, et al. v. Dept. of Energy, et al.*, 67 U.S.L.W. 3361 (1998). Thus, that ruling is now final.

48. Despite the rulings in *Indiana Michigan* and *Northern States Power*, the Defendant has wholly failed to honor its contractual obligation to accept HLW/SNF. Not only did the Defendant fail to do so by the contractual and statutory deadline of January 31, 1998, but to date, the Defendant has failed to dispose of any HLW/SNF. In fact, the Defendant has stated that it will not begin to dispose of HLW/SNF until 2010, at the earliest.

**Status of Trojan's HLW/SNF**

49. As Trojan was a closed facility, its HLW/SNF could, should, and would have received priority for disposal under the Contract. Now, instead of January 31, 1998, DOE has stated that it would not begin to take HLW/SNF until 2010 at the earliest. In fact, under DOE's latest schedule, the last of Trojan's HLW/SNF would not be taken until 2039. Moreover, DOE's statement provides no guarantee that HLW/SNF would actually begin to be disposed of even in 2010 or that Trojan's HLW/SNF would be given priority.

50. Had disposal begun in January 1998 -- and shut down plants been given priority -- the last of Trojan's HLW/SNF would have been taken by 2002.

51. Due to the Defendant's statements and actions making clear that it would not remove or dispose of Trojan's HLW/SNF in a timely manner, Plaintiffs were forced to plan for and ultimately construct the ISFSI in order to avoid the high cost of continued wet storage of SNF and thus mitigate damages from Defendant's breach. Construction began in 2000. The capital cost of the ISFSI is approximately $88.1 million, all of which was incurred after January 31, 1998.

52. In addition, Plaintiffs face costs for the operation and maintenance of the ISFSI beginning in 2004 and continuing until DOE accepts the last of Trojan's HLW/SNF. These costs amount to approximately $4 million per year, plus appropriate inflation adjustments.

53. Building the ISFSI provided a less costly method for Plaintiffs to store SNF than wet storage, since operation and maintenance costs are less for the ISFSI dry storage facility. Thus, construction of the ISFSI mitigated the damages Plaintiffs would have incurred had Plaintiffs continued to store SNF in wet storage.

54. If Defendant continues to ignore its obligations under the Contract, and/or continues to demonstrate its intentions to refuse to dispose of the Trojan HLW/SNF, Plaintiffs reserve all rights to assert new and separate claims in the future founded upon those actions.

## CLAIMS FOR RELIEF

### Count I

### Breach of Contract

55. Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 54 above, as if stated herein.

56. The Contract created an unconditional obligation that upon payment by Plaintiffs of fees specified under the Contract, DOE would dispose of HLW/SNF beginning no later than January 31, 1998.

57. Defendant could, should, and would have accorded priority, in its disposal program for HLW/SNF from shut down plants.

58. DOE's failure to begin disposing of the HLW/SNF by January 31, 1998 and its statements that it would not begin to dispose of the HLW/SNF until 2010 at the earliest, and that it would not complete disposal of Trojan's HLW/SNF before 2039, are partial breaches by the Defendant of its unconditional express obligations under the Contract.

59. Those partial breaches entailed a failure to accord priority to the disposal of HLW/SNF from shut down plants.

60. As a direct and proximate result of the Defendant's partial breach of the Contract, Plaintiffs have been damaged. Plaintiffs have incurred and will incur additional costs associated with the construction, and continued operation and maintenance, of the ISFSI facilities. Moreover, Plaintiffs have been deprived and will be deprived of the use of the real property required for construction of the ISFSI facilities, and the use of all the real property comprising the Trojan site.

61. As a result, the Defendant is liable to Plaintiffs for damages for its partial breach of contract in the amount of at least $217 million.

**Count II**

**Breach of Contract**

**(Breach of Implied Duty of Good Faith and Fair Dealing)**

62. Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 61 above, as if stated herein.

63. The Contract between Plaintiffs and DOE imposed an implied duty of good faith and fair dealing on DOE. *Inter alia*, that duty required DOE to accord priority to HLW/SNF from shut down plants such as Trojan.

64. DOE breached its duty of good faith and fair dealing by its failure to make progress on the disposal of HLW/SNF as provided in the Contract, its failure to begin disposing of the Trojan HLW/SNF by January 31, 1998, its statements that it would not begin to dispose of the HLW/SNF until 2010 at the earliest, and that it would not complete disposal of Trojan's HLW/SNF before 2039, and its failure to acknowledge a priority for disposal of HLW/SNF from shut down plants.

65. As a direct and proximate result of the breach of DOE's duty of good faith and fair dealing, Plaintiffs have been damaged. Plaintiffs have incurred and will continue to incur

additional costs associated with the construction, and continued operation and maintenance, of the ISFSI facilities. In addition, Plaintiffs have been deprived and will be deprived of the use of the real property required for construction of the ISFSI facilities, and the use of all the real property comprising the Trojan site.

66. As a result, Defendant is liable to Plaintiffs for damages for its breach of the implied duty of good faith and fair dealing in the amount of at least $217 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief against the United States:

A. Damages for the partial breach of contract in the amount of at least $217 million;

B. Any and all interest, costs, and attorneys' fees permitted by law; and

C. Any and all other relief, as this Court deems just and proper.

Respectfully submitted,

/s/Michael J. Henke

Michael J. Henke
Vinson & Elkins L.L.P.
The Willard Office Building, Suite 600
1455 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-1008
Telephone: (202) 639-6529
Facsimile: (202) 639-6604

Counsel of Record for Plaintiffs

*Of Counsel:*

David A. Aamodt
Portland General Electric Company
121 S.W. Salmon Street
Portland, Oregon 97204
Telephone: (503) 464-8861

G. Kevin Kiely
Cable Huston Benedict Haagensen
& Lloyd, LLP
1001 S.W. 5th Avenue
Portland, Oregon 97204-1136
Telephone: (503) 224-3092

Natalie L. Hocken
PacifiCorp
825 N.E. Multnomah Street, Suite 1800
Portland, Oregon 97232
Telephone: (503) 813-7205

Tegan M. Flynn
Vinson & Elkins L.L.P.
The Willard Office Building, Suite 600
1455 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-1008
Telephone: (202) 639-6598

Dated: July 20, 2004