# In the United States Court of Federal Claims

No. 04-09C
(Filed: August 26, 2011)

* * * * * * * * * * * * * * * * * *

PORTLAND GENERAL ELECTRIC
COMPANY, CITY OF EUGENE,
OREGON, acting by and through the
EUGENE WATER AND ELECTRIC
BOARD, and PACIFICORP,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * **

Government Contracts; Spent
Nuclear Fuel; Nuclear Waste;
Nuclear Repository; Unavoidable
Delays; Avoidable Delays;
Motion to Dismiss

*Brad Fagg*, Washington, D.C., for plaintiffs. *Paul M. Bessette*, of counsel.

*Patrick B. Bryan*, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Harold D. Lester, Jr.*, Assistant Director for defendant.

_____

## OPINION

_____

BRUGGINK, *Judge*.

This is an action for partial breach of contract by plaintiffs, electrical utilities, against the government, acting through the Department of Energy, for failing to begin picking up spent nuclear fuel from plaintiffs' nuclear-fueled electric generation facilities on January 31, 1998. A number of related cases are pending at the court. The government raises a contractual provision as its

first affirmative defense. Plaintiffs have moved to dismiss, strike, and for judgment on the pleadings with respect to that affirmative defense. As part of its motion, plaintiffs request an *in limine* order to preclude the government from offering evidence at trial in support of the affirmative defense.

The matter is fully briefed. Oral argument was held on July 22, 2011, at which time we announced our decision to grant the motion. *See Portland Gen. Elec. Co. v. United States*, No. 04-09 (Fed. Cl. Jul. 22, 2011) (order granting motion to strike). As we explain below, defendant's affirmative defense of unavoidable delays is proscribed as a matter of law, and we therefore strike it. Accordingly, we also grant an *in limine* order prohibiting the government from offering any evidence at trial in support of that defense.

FACTUAL BACKGROUND

Plaintiffs operated the Trojan Nuclear Power Plant near Rainier, Oregon from 1975 until its shutdown and defueling in January 1993. In 1982, Congress enacted the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101–10270 (2006). The NWPA codified the federal government's "responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment." *Id.* § 10131(a)(4). The NWPA provided a process for storage and disposal of high level waste and spent nuclear fuel (hereafter referred to collectively as "SNF"). The NWPA authorized the Secretary of Energy to enter into contracts with owners and generators of SNF to dispose of such material. Pursuant to section 302 of the NWPA, the Standard Contract for the disposal of SNF was developed; it is published at 10 C.F.R. § 961.11 (2011).

On June 13, 1983, Portland General Electric Company ("PGE"), on behalf of itself, the Eugene Water and Electric Board, and Pacific Power & Light (a predecessor-in-interest of PacifiCorp), entered into a written contract with defendant known as the "Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, U.S. Department of Energy Contract No. DE-CR01-83NE4406." The material terms are published at 10 C.F.R § 961.11. In this contract, plaintiffs agreed to purchase DOE's services for disposal of SNF produced by the Trojan facility. The contract required defendant to begin disposing of SNF by January 31, 1998. Defendant has not yet begun disposal of SNF.

2

Article IX of the Standard Contract, entitled "DELAYS," contains two clauses regarding delays. The first clause concerns *unavoidable* delays by the purchaser or DOE. It reads, in its entirety:

> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE–such as acts of God, or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather–cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

10 C.F.R. § 961.11 (2011) (art. IX, cl. A).

The second clause concerns *avoidable* delays by the purchaser or DOE and reads, in its entirety:

> In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE with or their respective contractors or suppliers, the charges and schedules specified by the contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

*Id.* (art. IX, cl. B).

## LEGAL BACKGROUND

Courts have held that the NWPA created a duty on the part of the goverment to begin disposing of SNF. In *Indiana Michigan Power Company v. Department of Energy*, 88 F.3d 1272 (D.C. Cir. 1996), utility companies

challenged DOE's interpretation of the NWPA. The agency had taken the position that it would be unable to accept SNF by early 1998 and that it had no duty to do so in the absence of a functioning nuclear repository. The D.C. Circuit disagreed and held that section 302(a)(5)(B) of the NWPA created an obligation on the part of DOE, reciprocal to the utilities' obligation to pay, to start disposing of SNF by January 31, 1998. *See id.* at 1277.

Despite the ruling in *Indiana Michigan*, DOE informed utility companies that it would not begin to collect the SNF by the 1998 deadline. The companies then sought a writ of mandamus to compel DOE to dispose of the SNF. In *Northern States Power Co. v. United States Department of Energy*, 128 F.3d 754, 756 (D.C. Cir. 1997) ("*Northern States I*"), the D.C. Circuit reaffirmed its ruling in *Indiana Michigan*, noting that "[p]etitioners have established that they have a clear right to relief." *Id.* at 756  The court refused to grant the broader mandamus relief sought by the utilities, however, noting that the Standard Contract "provides a potentially adequate remedy if DOE fails to fulfill its obligations by the deadline." *Id.* Nevertheless, the court held that the petitioners' ability to enforce the contract "would be frustrated if DOE were allowed to operate under a construction of the contract inconsistent with [its] prior conclusion that the NWPA imposes an obligation on DOE 'without qualification or condition.'" *Id.* at 759. Consequently, the court ordered "DOE to proceed with contractual remedies in a manner consistent with the NWPA's command that [DOE] undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." *Id.* at 760. The mandamus "preclude[d] DOE from concluding that its delay [was] unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Id.*

The D.C. Circuit later clarified the scope of its *Northern States I* mandamus in *Wisconsin Electric Power Co. v. United States Department of Energy*, 211 F.3d 646 (D.C. Cir. 2000), stating that in prior cases "we expressed no opinion about the relief the DOE would have to provide for breach of that obligation [to dispose of SNF]." *Id.* at 648. The court suggested that "[t]he Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes." *Id.*

The focus of litigation thereafter shifted to this court and the Court of Appeals for the Federal Circuit. In *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000), the Federal Circuit held that the avoidable delays clause likewise did not apply to the government's industry-

wide breach. There, a utility company sought to recover costs of SNF storage caused by the government's failure to dispose of SNF. The government argued that its non-performance fell under the avoidable delays clause of the Standard Contract, Article IX.B, and that damages were limited to those permitted under that clause. The Federal Circuit, however, rejected that argument, construing the avoidable delays clause to refer only to those "specified kinds of delays, namely, those 'in the delivery, acceptance or transport' of nuclear waste." *Id.* at 1341. Moreover, the court noted that for that clause to be implicated, "the parties must have begun performance of their obligations relating to disposal of the nuclear waste." *Id.* at 1341. Thus, the avoidable delays clause did not apply to the government's broad, industry-wide breach, and did not apply when performance had not even begun.[1] *Id.*

In 2010, the Federal Circuit was confronted with the issue of whether the D.C. Circuit's decisions in *Indiana Michigan* and *Northern States I* were entitled to res judicata effect in the Court of Federal Claims; the court concluded they were. *Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357, 1376 (Fed. Cir. 2010) ("*NPPD*"). The Federal Circuit rejected the government's argument that the unavoidable delays clause excused its non-performance. The Federal Circuit noted that, "The D.C. Circuit's order prohibited the government from using contract interpretation as a means of avoiding its statutory obligation under section 302, which the D.C. Circuit was authorized to do as a means of enforcing the statutory claim that was brought before it in *Indiana Michigan*." *Id.* at 1365. Nor did the D.C. Circuit's decision "improperly intrude on the jurisdiction of the Court of Federal Claims to address NPPD's breach of contract claim." *Id.* Instead, the D.C. Circuit's mandamus was "limited to prohibiting the government from acting in derogation of its statutory obligations under the NWPA." *Id.* at 1373.

As the Federal Circuit explained, the orders of the D.C. Circuit were an exercise of its authority to interpret the DOE's statutory responsibilities, and

---

[1] In *Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000) ("*Northern States II*"), the Federal Circuit stated, "the unavoidable delays provision deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." While this statement would appear to resolve the present issue, the government plausibly contends that the use of the term "unavoidable" was a typographical error.

"did not address any issue of contract breach, direct the implementation of any remedy, or construe any contract defense, except to the extent that the proposed interpretation of the contract would conflict with the statutory directive in section 302(a)(5)." *Id.* at 1376. Therefore, "except to the extent that the D.C. Circuit's ruling on the statutory question controls as a matter of res judicata, it is within the authority of the Court of Federal Claims to interpret, apply, and enforce the provisions of the Standard Contract." *Id.* at 1375.

The Court of Federal Claims has subsequently applied *NPPD* to preclude the unavoidable delays clause defense in other SNF cases. *See Consol. Edison Co. v. United States*, 92 Fed. Cl. 466, 475 n.2 (2010) (indicating that the court need not address the unavoidable delays defense because of *NPPD*); *Entergy Nuclear Fitzpatrick v. United States*, 93 Fed. Cl. 739, 746 (2010) ("Allowing the Government to use the clause to negate a damages award would be permitting what the D.C. Circuit had already prevented.").

More recently, the Federal Circuit has addressed the unavoidable delay clause in *Southern Nuclear Operating Co. v. United States*, 637 F.3d 1297 (Fed. Cir. 2011). It concluded that the government had waived the defense in that case by failing "to raise the unavoidable delays clause here and because this failure was not compelled by the District of Columbia Circuit's mandamus in *Northern States*." *Id.* 1306. The court expressly did not reach the question of "whether the 'unavoidable delays' clause could provide a defense to expectancy damages." *Id.*

Plaintiffs take the position that the effect of the decisions by the D.C. Circuit and the Federal Circuit discussed above means that the unavoidable delay clause is no longer available as a defense. They offer two independent theories as to why this should be so. First, plaintiffs argue that the Federal Circuit's decision in *NPPD* held that the results in *Northern States I* and *Indiana Michigan* are entitled to res judicata effect here. Consequently, the government is barred from relying upon the unavoidable delays defense to excuse its non-performance. Second, plaintiffs contend that *Maine Yankee*'s holding that the industry-wide, pre-performance breach is not a delay within the avoidable delays clause, means that it is also not a delay within the unavoidable delays clause. Plaintiffs also contend that, irrespective of any prior decisions, the defense is unavailable because the lack of a nuclear waste repository was foreseeable and not beyond the control of the government.

Defendant makes three principal responses: First, accepting plaintiffs' interpretation of past precedent would render the unavoidable delays clause meaningless. Second, *NPPD* and *Southern Nuclear* establish that the government may invoke the unavoidable delays defense to reduce any damages. Third, neither *Maine Yankee* nor *Northern States II* apply, because both dealt with the avoidable delays clause, rather than the unavoidable delays clause. Finally, if the court were to entertain plaintiffs' third argument—that the defense fails on the merits—defendant contends that issues of fact preclude summary judgment without further discovery.

For the reasons set out below, we agree with plaintiffs that *NPPD* and *Northern States I* preclude the government from using the existence or non-existence of a repository to invoke the unavoidable delays clause, and alternatively, that *Maine Yankee*'s determination that the government's industry-wide pre-performance breach is not an avoidable delay under Article IX.B requires a holding that it is not an unavoidable delay under Article IX.A. As we explained at oral argument, we decline to consider the third argument posed by plaintiffs. It inevitably triggers questions of fact, and therefore prompts defendant's request for additional discovery. Both of plaintiffs' primary arguments are meritorious and can be resolved as questions of law.

## DISCUSSION

I.   *NPPD* and *Northern States I* Held that the Non-Existence of a Repository is Not an Unavoidable Delay

*NPPD* prohibits the government from bringing an unavoidable delays defense in this case because the existence or non-existence of a repository does not affect in any way the government's unconditional obligation to dispose of SNF. The *Northern States I* mandamus order "preclude[s] DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Northern States I*, 128 F.3d at 760. The Federal Circuit construed *Northern States I* to mean that, "based on its interpretation of the NWPA . . . the government's failure to have a repository ready by January 31, 1998, could not be excused as unavoidable delay." *NPPD*, 590 F.3d at 1375.

These decisions would appear to resolve the pending motion, and defendant indeed concedes that liability for breach is fixed.[2]  Yet it persists in making the observation that plaintiffs in *Indiana Michigan* and *Northern States I* did not bring an action for breach of contract and relies on the following language in *NPPD*: "[T]he D.C. Circuit properly left all issues of contract breach, enforcement, and remedy to be determined in the litigation before the Court of Federal Claims."  590 F.3d at 1365.[3]  These statements are true, but irrelevant to plaintiffs' argument.  We must account for the res judicata effect of the previous rulings, despite the fact that the D.C. Circuit's ruling did not decide contract issues *qua* contract issues.  As the Federal Circuit has told us, the D.C. Circuit rulings "could affect subsequent contract litigation."  *Id.* at 1371 n.7; *see also id.* at 1376 ("[I]t was clear that the D.C. Circuit's remedial order would affect later litigation over contract-based rights.").  Moreover, the Federal Circuit gave res judicata effect to the "ban [upon] DOE from doing under the rubric of contract interpretation what section 302(a)(5)(B) prohibited as a matter of statutory compulsion."  *Id.* at 1372.  *Northern States I* and *NPPD* both held that the non-existence of a repository is not an unavoidable delay, and because defendant's affirmative defense justifies its invocation of unavoidable delays by the non-existence of a repository, we are compelled to apply that ruling here.

We note, moreover, that in *Northern States I*, the court explicitly required enforcement of the government's statutory duty: "To effectuate DOE's duty, as we recognized in *Indiana Michigan*, petitioners must be able to enforce the terms of the contract in a meaningful way."  128 F.3d at 759.  The D.C. Circuit did not fully grant the writ because "the Standard Contract between DOE and the utilities provides a potentially adequate remedy if DOE fails to fulfill its obligations by the deadline."  *Id.* at 756.  *Northern States I* was explicit that the court "decline[d] to issue the broad writ of mandamus because [petitioners] are presented with another potentially adequate remedy."  *Id.* at 759.  The right to relief stems from DOE's "clear duty to take the SNF from the owners and generators by the deadline imposed by Congress."  *Id.* at

---

[2] "[W]e are not contesting liability at all . . . ."  Def.'s Opp'n to Pls.' Mot. to Dismiss, Strike And/Or for J. ("Def.'s Opp.") 14-15; "[A]pplication of the unavoidable delays clause cannot shield the Government from liability for its delayed performance . . . ."  Def.'s Opp. 16.

[3] Defendant relies heavily on the concurrence in *NPPD*; however, concurrences have no binding authority.  *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting concurrences are not binding precedent).

758-59.  If the contract delays clause were applied here as defendant proposes, plaintiffs effectively would have no remedy for breach.  *See Entergy Nuclear*, 93 Fed. Cl. at 746 ("[A]llowing the Government to use the [unavoidable delays] clause to negate a damages award would be permitting what the D.C. Circuit has already prevented.").

Defendant also makes the more nuanced argument that, although liability for breach is fixed, the ruling in *NPPD* does not preclude the "application of the unavoidable delays clause . . . to reduce the amount of expectancy damages to which a plaintiff is entitled."  Def.'s Opp. 16 (citing *NPPD*, 590 F.3d at 1362-63, 1365, 1376-77).  According to defendant, the clause has an independent application when it comes to the determination of damages.

Neither in its briefing nor at oral argument could defendant explain how the D.C. Circuit's rulings preclude use of the unavoidable delays clause as a defense to liability for breach, but not as a defense to damages.  We view the delays clause as an affirmative defense to *liability*: "[n]either the Government nor the Purchaser shall be liable under this contract for damages . . . ."  Article IX.A  Unlike the avoidable delays clause, the text of the unavoidable delays clause thus contemplates either a complete defense to liability or no defense at all.  It either excuses what would otherwise be a breach due to non-performance, or it does not.  Here it does not.  There is no further room for it to operate.

Defendant suggests, however, that this apparent conundrum is explained because the clause, although not available here as a defense to breach, can be applied to limit the *type* of remedy to which plaintiffs are entitled.  In other words, while plaintiffs might be entitled to restitution,[4] for example, they cannot recover expectancy damages because the government's non-performance was excused.  We disagree.  Breach occurs at a particular moment in time.  Here it is undisputed that breach occurred on January 31, 1998, when the government did not begin to pick up spent nuclear fuel.  *See Me. Yankee*, 225 F.3d at 1343.  We are unable to hypothesize a scenario that there is breach on that date, but no damages accrue because performance is

---

[4] This is not much of a concession.  Plaintiffs have not, and presumably cannot, ask for restitution—a theory of liability which seeks the unwinding of the contract, plainly not an option here.

excused.  The two concepts are mutually exclusive; if damages do not accrue, it is because performance is excused, i.e., there is no breach.[5]

## II.    Complete Failure to Perform is Not "Delay" Within the Meaning of Article IX

Plaintiffs also make the independent argument that complete non-performance cannot be a "delay" within the meaning of the unavoidable delays clause, because *Maine Yankee* determined that it was not a delay within the meaning of the avoidable delays clause.  Defendant responds that the clauses are not identical and the ruling in *Maine Yankee* is therefore not controlling.

At issue in *Maine Yankee* was whether utilities asserting breach of the Standard Agreement first had to exhaust their administrative remedies.  The court held that they did not.  In the process, it had to deal also with the government's argument that non-performance constituted an avoidable delay within the meaning of the avoidable delays clause: "In the event of any delay in the delivery, acceptance or transport of SNF . . . by DOE caused by circumstances within the reasonable control of . . . DOE . . . the charges and schedules specified by the contract will be equitably adjusted . . . ."  Art. IX.B.  The court held that total non-performance did not trigger the adjustments contemplated in the clause:

> The provision is not a general one covering all delays, but a more limited one dealing with specified kinds of delays, namely, those "in the delivery, acceptance or transport" of nuclear waste.  These involve particular delays involving individual contractors. They are the kind of delays that routinely may arise during the performance of the contract.  For them to arise, however, the parties must have begun performance of their obligations relating to disposal of the nuclear waste.

> Yankee's claim against the government is far broader than one for improper delays by the Department in performing its contractual obligations.    Yankee contends that the government breached a critical and central obligation of the

---

[5] The ruling of the Federal Circuit in *Southern Nuclear* is not to the contrary.  The court made clear that it "need not reach the question posed by the *Nebraska Public Power* concurrence as to whether the 'unavoidable delays' clause could provide a defense to expectancy damages."  637 F.3d at 1306.

contract that it begin disposal of nuclear waste by January 1, 1998.   Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement.   The breach involved all the utilities that had signed the contract—the entire nuclear electric industry.   The language of the avoidable delays provision of the contract cannot properly be read to cover Yankee's claim.

*Me. Yankee*, 225 F.3d at 1341-42.

Article IX.A., the unavoidable delays clause, provides that neither the government nor the utility "shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform."   The clause then goes on to furnish a presumably non-exhaustive list of examples: "acts of God, or of the public enemy, acts of the Government in either its sovereign or contractual capacity,[6] fires, floods, epidemics."   The failure to perform must arise "out of causes beyond the control. . . of the party failing to perform."   Art. IX.A.   Thus, whereas the avoidable delays clause allows for equitable adjustment of the contract to compensate for added costs, the unavoidable delays clause contemplates no liability whatsoever.

Both clauses are triggered by the occurrence of a delay.   While defendant is correct that the clauses apply in different circumstances, and the holding of *Maine Yankee* is not directly controlling, the "delay" it seeks to excuse in the present case is identical to the one confronting the court in *Maine Yankee*, to wit, total non-performance.   Consequently, the court's conclusion that a total failure to commence performance cannot be characterized as a delay is highly relevant.   Indeed we see no reason for a different construction of the term as used within the same article of the contract.

We view it as immaterial that defendant seeks to argue that "disruptions caused by a particular third party, the state of Nevada, unavoidably delayed the Government's SNF removal program," Def.'s Opp. 9.   Nothing in the contract suggests that the government's obligation turned on the availability of a site in Nevada.

---

[6] The government does not assert a "sovereign acts" defense. *See* Def.'s Opp. 14.

11

The court in *Maine Yankee* was concerned that construing non-performance as delay would be tantamount to depriving utilities of the benefit of their bargain: "[T]he narrow specified relief available under the excusable delays provision would fall far short of the relief necessary adequately to compensate Yankee for the damages it alleges it suffered from the government's breach of the contract." *Me. Yankee*, 225 F.3d at 1342. The same concern is even more apparent here, where the essence of the bargain—paying the government to pick up SNF in lieu of utilities having to store it—would vaporize if there were no consequence to the government if it simply fails to perform. As in *Maine Yankee*, total non-performance cannot be characterized as "delay." The government's failure to perform thus does not constitute a delay within the meaning of Article IX.[7]

## CONCLUSION

Plaintiffs' motion to dismiss, strike, or for judgment on the pleadings is granted. Defendant may not introduce evidence at trial in support of the defense.

s/ Eric G. Bruggink
Eric G. Bruggink
Judge

---

[7] Which is not to say that it is surplusage. Assuming the government had commenced performance but one of the circumstances contemplated in either Article IX.A or B applied, the defense to breach still could be asserted or a cost adjustment made.